UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELVIS MOSQUEA,

     Plaintiff,

     -against-

CITY OF NEW YORK; CITY OF NEW
YORK DEPARTMENT OF CORRECTION;
DORA B. SCHRIRO; JOSEPH PONTE;
MICHAEL HOURIHANE; MARTIN J.
MURPHY; LUIS RIVERA; TONY
DURANTE; FLORENCE FINKLE;
MICHAEL BLAKE; Correction Officer
KEOSHA MAYNARD (Shield # 17254);
Correction Officer STEPHEN IMPASTATO
(Shield # 17273); Correction Officer
CHRISTINE BEHARIE (Shield # 11117);
Captain ODETTA WILLIAMS (Shield #
1201); Correction Officer RODNEY WOODS
(Shield # 15750); Correction Officer
REGINALD FISHER (Shield # 11909);
Captain JOY MATHEW (Shield # 692);
Captain ROSE MUNIZ (Shield # 1687);
Correction Officer EDWARDS (Shield #____);
Captain DESMOND BLAKE (Shield # 1604);
Captain DUKE RUTHERFORD (Shield
#1367); Correction Officer ROBERT
CROCKER (Shield # 9303); Correction
Officer GAMORY (Shield # 12025);
Correction Officer ALADIN (Shield # 7920);
Correction Officers JOHN DOES #s 1-9
(Shield #s____),

     Defendants.

Case No.  15-cv-9410 (PKC)

**PLAINTIFF'S FIRST AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

ECF CASE

## <u>PRELIMINARY STATEMENT</u>

1.     Plaintiff Elvis Mosquea brings this action pursuant to 42 U.S.C. § 1983 for relief for violations, under color of law, of his civil rights under the Eighth and Fourteenth Amendments of the United States Constitution.

2.     Mr. Mosquea was subjected to excessive force by Defendant uniformed officers employed by the City of New York Department of Correction ("DOC" or "the Department") while Mr. Mosquea was in DOC custody and confined at the Anna M. Kross Center ("AMKC") of the Rikers Island Correctional Facility ("Rikers") on two occasions: December 20, 2012 and May 21, 2015.

3.     Mr. Mosquea was brutally beaten in an unprovoked attack on December 20, 2012 by Defendant uniformed officers employed by DOC while Mr. Mosquea was in DOC custody and confined at the AMKC of Rikers.  Inadequately trained DOC staff members assaulted Mr. Mosquea with deliberate indifference to Mr. Mosquea's health, safety and wellbeing.

4.     Following that assault, Defendant DOC staff failed to follow protocol and with deliberate indifference to Mr. Mosquea's health, safety and wellbeing, deprived Mr. Mosquea of prompt and adequate medical care, resulting in his suffering intense pain and enduring serious and lasting injuries.

5.     Among the physical and emotional injuries that Mr. Mosquea suffered as a result of the December 20, 2012 assaults were multiple contusions and bruises to his head, face and body, nightmares, depression, headaches, and a broken tooth.

6.     On May 20, 2015, Mr. Mosquea was again brutally and excessively beaten by Defendant uniformed officers employed by the DOC while Mr. Mosquea was in DOC custody

2

and confined at the AMKC at Rikers. Inadequately trained DOC staff members assaulted Mr. Mosquea with deliberate indifference to Mr. Mosquea's health, safety and wellbeing.

7. Following that assault, Defendant DOC staff again deprived Mr. Mosquea of prompt and adequate medical care.

8. Among the physical and emotional injuries that Mr. Mosquea suffered as a result of the May 21, 2015 assault were multiple contusions and bruises to his head, face and body, nightmares, and back pain.

9. Mr. Mosquea suffered injuries as the direct result of Defendant DOC employees' reckless and deliberately indifferent assaults and Defendants' reckless and deliberately indifferent failures to (1) participate in and conduct appropriate DOC employee training at Rikers, (2) remedy or address the known pattern of DOC correction officer abuse of inmates, (3) follow protocol with respect to intake and transfer procedures, (4) safeguard Mr. Mosquea's health and safety, and (5) provide adequate and prompt medical care following Mr. Mosquea's beatings.

10. Upon information and belief, at the time of the beatings on December 20, 2012 and May 21, 2015, Defendants were aware of the long history of widespread abuse of inmates held in New York City jails, including the use of excessive force by Department members resulting in serious injuries to inmates. Defendants were negligent in failing to take sufficient action to prevent the brutality twice inflicted on Mr. Mosquea.

11. Defendants' actions and systemic failures constitute cruel and unusual punishment and deprivation of liberty, and they caused Mr. Mosquea both physical and mental injuries. In the face of a culture of prisoner abuse and mistreatment, Defendants' failure to

prevent Mr. Mosquea's beatings is further evidence of Defendants' deliberate indifference to Mr. Mosquea's health, safety, and wellbeing.

12.    Mr. Mosquea seeks damages against all Defendants, as well as an award of attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

13.    This action is timely; it has been commenced within three years after the events upon which the claims are based.

## JURISDICTION AND VENUE

14.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a) because the matter is a civil action arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the Constitution of the United States, and under the Civil Rights Act, Title 42 U.S.C. §§ 1983 and 1988.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  The Southern District of New York is the judicial district in which a substantial part of the events or omissions giving rise to the claims at issue occurred.

## JURY DEMAND

16.    Mr. Mosquea demands a trial by jury in this action on each and all of his claims pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

**Plaintiff**

17.    Plaintiff Elvis Mosquea is a citizen of the United States and was confined at the Anna M. Kross Center, 18-18 Hazen Street, East Elmhurst, New York 11370, a Rikers' facility

in Bronx County at the time the December 20, 2012 and May 21, 2015 incidents occurred (DIN: 12A5697). DOC records state Mr. Mosquea's name is Billy Rasnick. Billy Rasnick was an alias that Mr. Mosquea had previously used; it is incorrectly the name associated with Mr. Mosquea's DIN Number in DOC records.

18. Mr. Mosquea was released from DOC custody on September 19, 2014. From September 19, 2014 to April 16, 2015, Mr. Mosquea was not in the custody of the DOC and resided in the Bronx, New York.

19. As of April 17, 2015, Mr. Mosquea was returned to DOC custody. He was housed at AMKC from April 17 to May 28 and from June 11 to July 27, 2015.

**Defendants**

20. Defendant City of New York ("City") is a municipal corporation.

21. Defendant City of New York Department of Correction ("DOC" or "the Department") is the agency responsible for supervising and operating Defendant City of New York's detention centers. The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders. The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

22. At all relevant times with respect to the December 20, 2012 incident, DORA SCHRIRO was the Commissioner of Defendant DOC, acting under the color of state law in the

capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such. Defendant Schriro is sued in her individual capacity.

23. JOSEPH PONTE is and has been the Commissioner of Defendant DOC since April 2014, and at all relevant times with respect to the May 21, 2015 incident, was acting under the color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Defendant Ponte is sued in his individual capacity.

24. At all relevant times with respect to the December 20, 2012 incident, MICHAEL HOURIHANE was the Chief of Department of DOC, acting under the color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Defendant Hourihane is sued in his individual capacity.

25. MARTIN J. MURPHY is and has been Chief of Department of Defendant DOC since February 2015, and at all relevant times with respect to the May 21, 2015 incident, was acting under the color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Defendant Murphy is sued in his individual capacity.

26. At all relevant with respect to the December 20, 2012 incident, LUIS RIVERA was the Warden of DOC with responsibility for the AMKC, acting under color of state law in the capacity of agent, servant, and employee of the City, within the scope of his employment as such. Defendant Rivera is sued in his individual capacity.

27. TONY DURANTE is and has been the Warden of DOC with responsibility for the AMKC since January 2015, and at all relevant times with respect to the May 21, 2015 incident, was acting under the color of state law in the capacity of agent, servant, and employee

of Defendant City, within the scope of his employment as such. Defendant Durante is sued in his individual capacity.

28. At all relevant times with respect to the December 20, 2012 incident, FLORENCE FINKLE was the Deputy Commissioner for Integrity and Policy, acting under color of state law in the capacity of agent, servant, and employee of the City, within the scope of her employment as such. Defendant Finkle is sued in her individual capacity.

29. MICHAEL BLAKE is and has been the Deputy Commissioner of the Office of Excellence / Investigations Division since September 2014, and at all relevant times with respect to the May 21, 2015 incident, was acting under color of state law in the capacity of agent, servant, and employee of the City, within the scope of his employment as such. Defendant Blake is sued in his individual capacity.

30. At the time of the December 20, 2012 incidents, Correction Officer KEOSHA MAYNARD was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such. Upon information and belief, Correction Officer Maynard worked at AMKC at the time of the incidents alleged herein, and participated in the beating of Mr. Mosquea, causing him serious injury. Correction Officer Maynard is sued in her individual capacity.

31. At the time of the December 20, 2012 incidents referred to herein, Correction Officer STEPHEN IMPASTATO was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Upon information and belief, Correction Officer Impastato worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in the

beating of Mr. Mosquea, causing him serious injury. Correction Officer Impastato is sued in his individual capacity.

32. At the time of the December 20, 2012 incidents, Correction Officer CHRISTINE BEHARIE was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such. Upon information and belief, Correction Officer Beharie worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in or witnessed and failed to intervene in the beating of Mr. Mosquea. Correction Officer Beharie is sued in her individual capacity.

33. At the time of the December 20, 2012 incidents referred to herein, Captain ODETTA WILLIAMS was a supervising officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such. Upon information and belief, Captain Williams worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in or witnessed and failed to intervene in the beating of Mr. Mosquea. Captain Williams is sued in her individual capacity.

34. At the time of the December 20, 2012 incidents referred to herein, Correction Officer RODNEY WOODS was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Upon information and belief, Correction Officer Woods worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in the beatings of Mr.

Mosquea, causing him serious injury.  Correction Officer Woods is sued in his individual capacity.

35.     At the time of the December 20, 2012 incidents referred to herein, Correction Officer REGINALD FISHER was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such.  Upon information and belief, Correction Officer Fisher worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in the beatings of Mr. Mosquea, causing him serious injury.  Correction Officer Fisher is sued in his individual capacity.

36.     At the time of the December 20, 2012 incidents referred to herein, Captain JOY MATHEW was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such.  Upon information and belief, Captain Mathew worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in the assault of Mr. Mosquea, causing him serious injury.  Captain Mathew is sued in his individual capacity.

37.     At the time of the December 20, 2012 incidents referred to herein, Captain ROSE MUNIZ was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such.  Upon information and belief, Captain Muniz worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and participated in the assault of Mr. Mosquea, causing him serious injury.  Captain Muniz is sued in her individual capacity

38.     At the time of the December 20, 2012 incidents referred to herein, Correction Officer EDWARDS was an officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Upon information and belief, Correction Officer Edwards worked at AMKC at the time of the December 20, 2012 incidents alleged herein, and viciously assaulted and beat Mr. Mosquea, causing him serious injury. Correction Officer Edwards is sued in his individual capacity

39.     At all times referred to herein, Captain DESMOND BLAKE was a supervising officer of the DOC for Central Intake, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Upon information and belief, Captain Blake worked at AMKC at the time of the incidents alleged herein, and participated in or witnessed and failed to intervene in both the December 20, 2012 and May 21, 2015 beatings of Mr. Mosquea. Captain Blake is sued in his individual capacity.

40.     Upon information and belief, Correction Officers John Does #1-9 (the "Doe Defendants #1-9") also comprise the AMKC "probe team," a specialized group of correction officers equipped with riot gear who respond to incidents and provide reinforcement. The Doe Defendants #1-9 are sued in their individual capacities.

41.     At the time of the May 20, 2015 incidents referred to herein, Captain DUKE RUTHERFORD was a supervising officer of the DOC, acting under color of state law in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such. Upon information and belief, Captain Rutherford worked at AMKC at the time of the May 21, 2015 incidents alleged herein, and participated in or witnessed and failed to intervene in the beating of Mr. Mosquea. Captain Rutherford is sued in his individual capacity.

42.     At the time of the May 21, 2015 incidents referred to herein, Correction Officer

ROBERT CROCKER was an officer of the DOC, acting under color of state law in the capacity

of agent, servant, and employee of Defendant City, within the scope of his employment as such.

Upon information and belief, Correction Officer Crocker worked at AMKC at the time of the

May 20, 2015 incidents alleged herein, and participated or witnessed and failed to intervene in

the beatings of Mr. Mosquea.  Upon information and belief, Correction Officer Crocker, also

comprised the AMKC "probe team," a specialized group of correction officers equipped with riot

gear who respond to incidents and provide reinforcement.  Correction Officer Crocker is sued in

his individual capacities.

43.     At the time of the May 21, 2015 incidents referred to herein, Correction Officer

GAMORY was an officer of the DOC, acting under color of state law in the capacity of agent,

servant, and employee of Defendant City, within the scope of his employment as such.  Upon

information and belief, Correction Officer Gamory worked at AMKC at the time of the May 20,

2015 incidents alleged herein, and participated or witnessed and failed to intervene in the

beatings of Mr. Mosquea.  Upon information and belief, Correction Officer Gamory, also

comprised the AMKC "probe team," a specialized group of correction officers equipped with riot

gear who respond to incidents and provide reinforcement.  Correction Officer Gamory is sued in

his individual capacities.

44.     At the time of the May 21, 2015 incidents referred to herein, Correction Officer

ALADIN was an officer of the DOC, acting under color of state law in the capacity of agent,

servant, and employee of Defendant City, within the scope of his employment as such.  Upon

information and belief, Correction Officer Aladin worked at AMKC at the time of the May 20,

2015 incidents alleged herein, and participated or witnessed and failed to intervene in the beatings of Mr. Mosquea. Upon information and belief, Correction Officer Aladin, also comprised the AMKC "probe team," a specialized group of correction officers equipped with riot gear who respond to incidents and provide reinforcement. Correction Officer Aladin is sued in his individual capacities.

45.     Correction Officer Mayard, Correction Officer  Impastato, Correction Officer Beharie, Captain Williams, Correction Officer Woods, Correction Officer Fisher, Captain Mathew, Correction Officer Muniz, Correction Officer Edwards, Captain Blake, Captain Rutherford, Correction Officer Croker, Correction Officer Gamory, Correction Officer Aladin, and Doe Defendants #1-9, those defendants referred to in paragraphs ¶¶ 30-44, are collectively referred to herein as the "Officer Defendants."

46.     The defendants referred to in paragraphs ¶¶ 22-29 are jointly referred to as "Supervisory Defendants."  Together, the Officer Defendants, the Supervisory Defendants, and the Defendant City, are the "Defendants."

47.     At all times relevant herein, the Officer Defendants were employees of the City of New York and acted within the scope of their employment under color of state law.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES NOT REQUIRED**

48.     This case involves a non-grievable issue pursuant to the Department of Corrections Directive 3376, the Inmate Grievance and Request Program, as revised on March 19, 2014.  There is therefore no requirement for Mr. Mosequea to exhaust any administrative remedies.

## STATEMENT OF FACTS

**Mr. Mosquea Was an Inmate Who Was Confined at Rikers on December 20, 2012**

49.     On December 20, 2012, Mr. Mosquea was an inmate at Rikers, a DOC

correctional facility located at 18-18 Hazen Street, East Elmhurst, NY 11370.

50.     On or about September 26, 2012 through December 27, 2012, Mr. Mosquea was

incarcerated at Rikers and housed in AMKC (Building C95) in quad 8 lower housing unit, in cell

8, the Punitive Segregation RHU Mental Observation Segregation Housing Unit (hereinafter, the

"Housing Unit").

**The Correction Officer Defendants Launched an Unprovoked Attack on Mr. Mosquea on December 20, 2012**

51.     On December 20, 2012, Mr. Mosquea was unjustifiably attacked during two

separate, but related, incidents.  First, at approximately 2:30 p.m., Correction Officer Stephen

Impastato escorted Mr. Mosquea from AMKC Central Intake to his Housing Unit.  Upon

arriving at Mr. Mosquea's Housing Unit, Mr. Mosquea was physically attacked by Correction

Officer Impastato, Correction Officer Woods, Correction Officer Fisher, Correction Officer

Maynard, Correction Officer Muniz, and Captain Mathew and the Doe Defendants #1-9 (the

"Initial Assault"), with the assistance of Captain Odetta Williams.  Second, after being escorted

back to Central Intake following the Initial Assault, Correction Officer Edwards, with the

assistance of Correction Officer Woods, Correction Officer Fisher, Captain Blake, and Captain

Williams, and other Doe Defendants, beat Mr. Mosquea while he was defenseless (the "Second

Assault").

   *The Initial Assault*

52.     Upon information and belief, when escorting an inmate from Central Intake to his housing unit, proper procedure requires that the inmate is initially "rear-cuffed," with the inmate's arms restrained in handcuffs behind his back.  Upon exiting Central Intake, a correction officer is instructed, pursuant to Rikers procedure, to take the inmate to the "Day Room" for a so-called "Three-Point Procedure:" (1) the inmate is strip searched; (2) the inmate is directed through a metal detector; and (3) the inmate is re-clothed.  The inmate is then "front-cuffed," with his arms bound in front of his body.  The accompanying correction officer is then instructed to escort the inmate to his housing unit.  Upon arrival at the housing unit, another officer is there to open the inmate's cell door.  The inmate is to enter his cell alone, and then stand with his back toward the door while the door is closed.  The inmate is then to turn around and extend his arms through a slot in the cell door, and the officer then removes the handcuffs.

53.     Upon information and belief, Correction Officer Impastato ignored this basic and established protocol.  Instead, Correction Officer Impastato escorted Mr. Mosquea from Central Intake directly to his Housing Unit, bypassing the required Three-Point Procedure and neglecting to properly adjust Mr. Mosquea's restraints.

54.     As Correction Officer Impastato escorted Mr. Mosquea to his Housing Unit, Correction Officer Impastato initiated a verbal exchange in which he tried to incite Mr. Mosquea.

55.     Upon arrival at his Housing Unit, Mr. Mosquea remained rear-cuffed.

56.     Correction Officer Christine Beharie, who, upon information and belief, was working in the Housing Unit, assisted Correction Officer Impastato in opening Mr. Mosquea's cell door.

57.     Without provocation or justification, Correction Officer Impastato then removed the handcuff from Mr. Mosquea's left wrist, pulled Mr. Mosquea back, and while holding on to Mr. Mosquea's left handcuff threatened Mr. Mosequea by saying to him, "Give me a reason."

58.     Mr. Mosequa feared that Correction Officer Impastato would act on his threat with physical force, and so he pulled his handcuffs away and moved toward the back of his cell, yelling for Correction Officer Beharie to close the cell door.

59.     Correction Officer Beharie did not close the cell door.  Instead, Correction Officer Impastato entered into Mr. Mosquea's cell.

60.     Upon information and belief, Department policies instruct guards to avoid blows to the head unless absolutely necessary.

61.     However, once inside Mr. Mosquea's cell, Correction Officer Impastato repeatedly punched Mr. Mosquea in the face and torso.

62.     During this time, Correction Officer Beharie watched from outside the cell, eventually telling Correction Officer Impastato that there were cameras in the Housing Unit galley that showed him entering Mr. Mosquea's cell and that for that reason he should exit the cell.

63.     After punching Mr. Mosquea repeatedly inside his cell, Correction Officer Impastato exited Mr. Mosquea's cell.  Mr. Mosquea followed Correction Officer Impastato out of the cell and into the galley and told Correction Officer Impastato to hit him in front of the cameras.

64.     Correction Officer Woods, Correction Officer Fisher, Correction Officer Maynard, and the Doe Defendants #1-9 were in the Housing Unit at the time for another purpose, some of whom were clothed in full riot gear and armed with sticks and mace.

65.     Correction Officer Woods, Correction Officer Fisher, Correction Officer Maynard and Captain Mathew, and the Doe Defendants #1-9 witnessed Mr. Mosquea's verbal exchange with Correction Officer Impastato in the middle of the galley, and they approached.  They surrounded Mr. Mosquea and began, unprovoked, to beat his body and head with their fists and sticks.

66.     After brief resistance by Mr. Mosquea, Correction Officer Woods, Correction Officer Fisher, Correction Officer Maynard and Captain Mathew, and the Doe Defendants #1-9 overpowered Mr. Mosquea, pinned him down on the floor, and rear-cuffed him.

67.     While restrained on the floor, not posing any threat to anybody, and unable to defend himself, Mr. Mosquea was maced approximately five times by at least Correction Officer Maynard and Captain Mathew, under the supervision of Captain Odetta Williams.  Correction Officer Woods and Fisher and the Doe Defendants #1-9  also punched, hit, and kicked Mr. Mosquea in the face, head, and back during this time, while Mr. Mosquea was restrained.

68.     The attack by Correction Officer Woods and Fisher and the Doe Defendants #1-9 left Mr. Mosquea with bruising and swelling on his head, face, and body, causing him tremendous pain.

69.     Mr. Mosquea remained handcuffed during and after the beating.

70.     Upon information and belief, Mr. Mosquea was then escorted back to Central Intake by at least Correction Officer Woods, Correction Officer Fisher, Correction Officer

Melendez, Correction Officer Omar Hartley, Correction Officer Jamar Mcleish and Correction Officer Carlos Melendez.

### *The Second Assault*

71.     At Central Intake, upon information and belief, Captain Desmond Blake instructed that the officers escorting Mr. Mosquea place him in Holding Pen #5.  This required first removing approximately twelve inmates from Holding Pen #5 into a different holding pen, which occurred at Captain Blake's instruction.

72.     Upon information and belief, Holding Pen #5 is the only holding pen in Central Intake without a camera.

73.     Once Mr. Mosquea was placed alone inside Holding Pen #5, a currently unidentified officer believed to be by the name of Correction Officer Edwards put on black gloves and at least Correction Officer Woods, and Correction Officer Fisher entered Holding Pen #5 and held Mr. Mosquea's face against the wall.

74.     Correction Officer Edwards then started punching Mr. Mosquea in the face.  Mr. Mosquea stated to Correction Officer Edwards, "You hit like my little sister."  Correction Officer Edwards then punched Mr. Mosquea in the face repeatedly while Correction Officer Woods and Correction Officer Fisher were holding and immobilizing Mr. Mosquea.

75.     Upon information and belief, Captain Muniz was also present in the area and witnessed the assault but did not intervene.

76.     Mr. Mosquea remained rear-cuffed during this beating, which lasted for approximately two minutes.

77.     The Second Assault was so severe that Mr. Mosquea's tooth was broken in half, exposing the nerve and causing excruciating pain.  It also caused further lacerations, swelling, and bruising.

78.     Captain Blake watched the Second Assault from outside Holding Pen #5.  Upon information and belief, he instructed Correction Officer Edwards to hit Mr. Mosquea.  Captain Odetta Williams and Captain Muniz were also present but did not intervene.

79.     Once the Second Assault ended, Mr. Mosquea sat in Holding Pen #5 for approximately forty minutes.

80.     Following the nearly forty minutes spent in Holding Pen #5, Captain Blake and Correction Officers John Does #1-2 finally took Mr. Mosquea to the "decontamination pen" to wash the mace from his face.  The mace had remained in his eyes and on his face since the Initial Assault, causing his eyes and face to burn.

81.     Captain Blake and Correction Officers John Does #1-2 then escorted Mr. Mosquea to the clinic in AMKC (the "Clinic").

82.     One of the two accompanying correction officers then threatened Mr. Mosquea by saying, "If you say anything we'll fuck you up again."  These officers remained present while Mr. Mosquea met with a doctor at the Clinic.  Because of the threat he had just received and the officers' presence at the Clinic, Mr. Mosquea did not report the assaults to the treating physician, Dr. Sein Than, until the following day.

83.     Upon information and belief, proper Department protocol calls for an infraction ticket be issued in response to any altercation involving an inmate.

84.     Upon information and belief, No infraction ticket was issued to Mr. Mosquea in response to either assault.

85.     On or around December 21, 2012, investigators from the Inspector General's office spoke to Mr. Mosquea about his injuries and the events that caused them. The investigators took photographs of the injuries sustained by Mr. Mosquea. They also took a verbal and written statement of Mr. Mosquea's account of the incidences.

86.     Upon information and belief, the investigators also took the statements of other witnesses.

**Mr. Mosquea Sustained Serious Injuries as a Result of the December 20, 2012 Assaults**

87.     Mr. Mosquea suffered both physical and emotional injuries as a result of his beatings—both the Initial Assault and Second Assault—by the Officer Defendants. Mr. Mosquea has further suffered because of the Officer Defendants' failure to allow Mr. Mosquea adequate and prompt medical treatment of his tooth, as described below.

88.     On December 20, 2012, following the assaults, Mr. Mosquea was diagnosed at the Clinic with a broken upper front tooth, an abrasion on his right buccal mucosa, swelling of his upper lip, redness on both sides of his face, and redness on both wrists, his right arm and right knee. All of these injuries were caused by the above-described beatings.

89.     On the following day, December 21, 2012, Mr. Mosquea was escorted back to the Clinic by a correction officer after Mr. Mosquea was observed spitting up blood, a result of his injuries. Dr. Than diagnosed Mr. Mosquea with whole scalp tenderness and swelling, an upper front tooth crack, and spine tenderness, all caused by the beatings from Defendants.

90.     Due to his head, neck, and tooth injury, Mr. Mosquea was sent to the Elmhurst Hospital on December 21, 2012.  His injuries were diagnosed as skin contusion, a broken tooth, and jaw pain.  Mr. Mosquea also complained of back and facial pain.  CT scans taken at the hospital showed swelling on his head, jaw line, and cheek.   These injuries were caused by his beatings at the hands of the Defendants.

91.     At Elmhurst Hospital, Mr. Mosquea was additionally informed that prompt follow-up with a dentist was required to save his tooth.

92.     However, Mr. Mosquea's broken tooth was not adequately treated during the ensuing nine-months period, during which Mr. Mosquea endured severe and excruciating pain in his face, head, and mouth due to nerve exposure and infections.

93.     In addition to the incessant pain Mr. Mosquea suffered, he also suffered extreme weight loss during these nine months due to his inability to comfortably eat, as a consequence of the beatings he suffered.

94.     When finally treated for his tooth injury, Mr. Mosquea had to have his tooth removed.

95.     As alleged herein, as a result of the beatings described above, Mr. Mosquea has also suffered from depression and experienced a loss of sleep.  He continues to suffer from extensive nightmares related to the incident.

**Defendants Failed to Adequately Treat Mr. Mosquea's Injuries Following the December 20, 2012 Assaults**

96.     As alleged above, Mr. Mosquea's tooth injuries required immediate medical attention in order to save his tooth and minimize the pain he was experiencing.

97.     Following his visit to the Elmhurst Hospital, Mr. Mosquea was scheduled for an appointment with a dental surgeon at the Elmhurst Oral Surgery Clinic on December 24, 2012.

98.     On December 24, 2012, however, the officers at Rikers failed to send Mr. Mosquea to his appointment.

99.     Mr. Mosquea's dental appointment was rescheduled for December 27, 2012, but again, the Rikers officers failed to send Mr. Mosquea to his appointment, this time because he was transferred to the Downstate Correctional Facility that same day.

100.    Due to the Rikers officers' delay, by the time Mr. Mosquea arrived at the Downstate Correctional Facility, his tooth had become infected and had developed an abscess.  A root canal to remove his exposed nerve was started but not completed.  In September 2013, Mr. Mosquea's tooth nerve was finally removed and replaced with an implant at the Livingston Correctional Facility.  The root of his tooth was not fully drained of infection until this time.

**Mr. Mosquea Was an Inmate Who Was Confined at Rikers on May 20 and 21, 2015**

101.    On or about September 19, 2014, Mr. Mosquea was released from prison.  He was rearrested on or about April 17, 2015 for violating his parole and criminal mischief.

102.    Following his arrest, Mr. Mosquea was placed in Rikers, where he remained an inmate in May 2015.

103.    On or about May 20 and 21, 2015, Mr. Mosquea was incarcerated at Rikers and housed in AMKC (Building C95) in quad 6 upper housing unit, in cell 23.

**The Correction Officer Defendants Employed Excessive Force Against Mr. Mosquea on or about May 21, 2015**

104.    On or about May 20, 2015, AMKC was in lockdown for majority of the day due to a technical service operation.  The inmates were not fed dinner until shortly before midnight that evening.

105.    On or around 12:30 a.m. on May 21, 2015, when Captain Desmond Blake entered quad 6 to escort the inmates to receive their medication, Captain Blake approached Mr. Mosquea's cell and informed him that he was "going to give [Mr. Mosquea] a reason to call [the Inspector General]."

106.    Mr. Mosquea recognized Captain Blake as one of the individuals whose custody he was under in December 2012 and who participated in the Second Assault on December 20, 2012.

107.    As a result of Captain Blake's comment, and in light of the previous attack on December 20, 2012, Mr. Mosquea feared for his safety and took a towel and broken broom sticks with him for protection as he was escorted out of his cell and toward the Clinic to receive his medication.

108.    Once in the corridor, Captain Blake ordered Mr. Mosquea to stand against the wall.

109.    Mr. Mosquea then pointed the sticks at Captain Blake, who, upon information and belief, radioed the "probe team."  Mr. Mosquea then threw the sticks on the floor.

110.    When the "probe team" arrived, Captain Skinner attempted to hit Mr. Mosquea with a walkie talkie and a brief altercation ensued.  Mr. Mosquea then ran up the hallway corridor toward his cell, but he could not enter quad 6 upper.

111.     Unable to enter his housing unit, Mr. Mosquea put his hands up on door outside quad 6 upper. The "probe team" then cuffed and maced Mr. Mosquea.

112.     While Mr. Mosquea was restrained, Captain Rutherford requested another can of mace and proceeded to spray Mr. Mosquea directly in the face with mace.

113.     The members of the "probe team," Correction Officer Robert Crocker, Correction Officer Gamory, and Correction Officer Aladin proceeded to punch Mr. Mosquea in the face, ribs, and body while he was on the floor. Mr. Mosquea remained handcuffed during this entire time. Mr. Mosquea did not, and could not, defend himself during this painful and brutal assault (the "May 2015 Assault").

114.     As stated above, upon information and belief, Department policies instruct guards to avoid blows to the head unless absolutely necessary. Upon information and belief, Correction Officer Robert Crocker, Correction Officer Gamory, and Correction Officer Aladin violated this direction.

115.     The May 2015 Assault left Mr. Mosquea with facial and bodily contusions, bruising and swelling, as well as continued back pain and eye problems.

116.     After the brutal beating sustained by Mr. Mosquea, Mr. Mosquea was escorted to Central Intake, where he was left for approximately ten minutes. He was then taken to the decontamination room to shower.

117.     Following the shower, Mr. Mosquea was taken to a urinalysis room, where he was left for three days without medical attention.

**Mr. Mosquea Sustained Serious Injuries as a Result of the May 21, 2015 Assault**

118.     Mr. Mosquea suffered both physical and emotional injuries as a result of his May 2015 beatings by the Officer Defendants.

119.     After three days without medical treatment, Mr. Mosquea was seen by a doctor and given a splint for his arm.  He continues to require physical therapy for his back and receive medication for inflammation, and he is on a waiting list for an MRI.  The assault also caused problems with his left eye, for which Mr. Mosquea is awaiting medical treatment and diagnosis.

120.     Further, as a result of the beatings described above, Mr. Mosquea continues to suffer from depression, anxiety, and sleep loss.

**There is a Systematic and Widespread Pattern and Practice of Excessive Force by Correction Officers at Rikers Island**

121.     Upon information and belief, Defendant DOC is and has been aware of decades of routine, dangerous and unconstitutional use of excessive force by DOC personnel.

122.     Upon information and belief, Defendant DOC has allowed such abuse to persist by conducting inadequate investigations of allegations of misconduct and failing to discipline officers in the face of obvious wrongdoing.

123.     Throughout the DOC and Rikers jails, there is a pervasive culture of regular and institutionalized staff violence against inmates, a failure of accountability at every level, and deliberate indifference to (and tolerance of) constitutional violations.

124.     The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders.

125.     Upon information and belief, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy.  These practices are widespread, long-standing, and deeply embedded in the culture of the agency.

126.     Defendant DOC is responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Officer Defendants referenced herein.  In addition, at all relevant times, the City was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York.

127.     Upon information and belief, Defendants Schriro and Ponte, as former and current Commissioner of DOC, were responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and were responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.  As Commissioners, Defendants Schriro and Ponte were also responsible for the care, custody, and control of all inmates housed in the Department's jails, including Mr. Mosquea.

128.     Upon information and belief, as Commissioners, Schriro and Ponte were provided on a regular basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails, and were consistently and regularly made aware of the number and severity of injuries sustained by inmates at the hands of staff members in "use of force incidents" in the jails.  In addition, at all relevant times, Defendants Schriro and Ponte were responsible for enforcing the rules of DOC, and for ensuring that DOC personnel obeyed the laws of the United States and of the State of New York.

129. Upon information and belief, as former and current Chief of Department, Defendants Hourihane and Murphy were the highest ranking uniformed members of the Department, and were responsible for the supervision, oversight, and discipline of the uniformed security staff in all the Department jails. They were also responsible for the care, custody, and control of all inmates in the Department jails.

130. Upon information and belief, as Chief of Department, Hourihane and Murphy were provided on a regular basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails, and were consistently and regularly made aware of the number and severity of injuries sustained by inmates at the hands of staff members in "use of force" incidents in the jails.

131. Upon information and belief, Defendants Finkle and Blake, as former Deputy Commissioner for Integrity and Policy and current Deputy Commissioner of the Office of Excellence / Investigations Division, were responsible for supervising the investigation of any and all incidents in which any employee of the Department used excessive force against any inmate, or is alleged to have used force, and recommending Department discipline against staff believed to have violated Department policies and rules including those concerning use of force. Defendants Finkle and Blake were provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails.

132. Upon information and belief, Defendants Rivera and Durante, as former and current Warden, were responsible for the training, supervision, and conduct of all personnel in the AMKC, including the Defendant Officers referenced herein. As Warden, Defendants Rivera and Durante were also responsible for the care, custody, and control of all inmates housed in the

AMKC. As Warden, Rivera and Durante were provided on a daily basis with reports of applications of force by staff, allegations of unreported use of force, and other breaches of security in the Department jails. In addition, at all relevant times, Defendants Rivera and Durante were responsible for enforcing the rules of the DOC, supervising uniformed personnel in the facility, and for ensuring their compliance with Department rules and policies.

133. Upon information and belief, the Department allows abuse to persist through inadequate investigations of improper use-of-force incidents and staff misconduct. The Department also perpetuates abuse in its jails by failing to discipline officers in the face of obvious wrongdoing, and by failing to protect prisoners from violent guards. As of the time Mr. Mosquea was beaten, the Supervisory Defendants were aware of the widespread use of excessive force against inmates, as well as the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it.

## CAUSES OF ACTION

### COUNT I

**DEPRAVATION OF PLAINTIFF'S CIVIL RIGHTS**
**42 U.S.C. § 1983; Eighth and Fourteenth Amendments**
**(Against All Officer Defendants)**

134. Mr. Mosquea repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 132 as if fully set forth herein.

135. By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, and brutal force, or failing to prevent other Officer Defendants from doing so, and by denying Mr. Mosquea access to prompt and adequate medical care, the Officer Defendants

violated Mr. Mosquea's rights under 42 U.S.C. § 1983 and deprived Mr. Mosquea of his constitutionally guaranteed rights, remedies, privileges and immunities, including the right to be free from cruel and unusual punishment under the Eighth Amendment and right to not be deprived of liberty without due process of law under the Fourteenth Amendment of the United States Constitution.

136.     Officer Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment as DOC officers and employees.  Said acts by Officer Defendants were beyond the scope of their employment, without authority of law, and in abuse of their powers.  These Officer Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Mosquea of his constitutional rights secured by 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution.

137.     As a direct and proximate result of the foregoing, Mr. Mosquea sustained the injuries alleged herein.

## COUNT II

**DEPRAVATION OF PLAINTIFF'S CIVIL RIGHTS**
**42 U.S.C. § 1983; Eighth and Fourteenth Amendments**
**(Against All Supervisory Defendants)**

138.     Mr. Mosquea repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 136 as if fully set forth herein.

139.     Defendants Schriro, Ponte, Hourihane, Murphy, Rivera, Durante, Finkle, and Blake were at all relevant times supervisors of the officers directly involved in either or all of the incidents.

140.     Due to the prevalence of excessive force against inmates and these Defendants'
general knowledge of its existence, as alleged herein, such Defendants Schriro, Ponte,
Hourihane, Murphy, Rivera, Durante, Finkle, and Blake knew that the pattern of physical abuse
described above existed in the City jails prior to and including the times of the assaults on Mr.
Mosquea.  Their failure to take measures to curb this pattern of brutality constitutes deliberate
indifference to and acquiescence in the known unlawful behavior of their subordinates.  These
Defendants' conduct has been a substantial factor in the continuation of such violence and a
proximate cause of the constitutional violations alleged in this Complaint.

141.     By failing to remedy the wrongs committed by their subordinates, in failing to
properly train, screen, supervise, or discipline their subordinates, the Supervisory Defendants
caused damage and injury in violation of Mr. Mosquea's rights guaranteed under the United
States Constitution, including its Eighth and Fourteenth Amendments, through 42 U.S.C. § 1983.

142.     As a direct and proximate result of the foregoing, Mr. Mosquea sustained the
damages alleged herein.

## COUNT III

**DEPRAVATION OF PLAINTIFF'S CIVIL RIGHTS**
**42 U.S.C. § 1983; Eighth and Fourteenth Amendments**
**(Against Defendant City, Department of Correction)**

143.     Mr. Mosquea repeats, reiterates, and realleges each and every allegation set forth
in this Complaint in paragraphs 1 through 140 as if fully set forth herein.

144.     Defendant City, through Defendant DOC, and acting under the pretense and color
of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff
brutality at the time of Mr. Mosquea's beatings.  This widespread tolerance of correction officer

abuse of prisoners constituted a municipal policy, practice or custom and led to the assaults against Mr. Mosquea.

145.     By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Mosquea was subjected to brutal beatings, Defendant City has deprived Mr. Mosquea of the rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Eighth and Fourteenth Amendment to be free from gratuitous and excessive force and the right to receive medical care.

146.     As a direct and proximate result of this policy, practice and custom detailed above, Mr. Mosquea sustained the damages hereinbefore alleged.

## COUNT IV

### NEGLIGENT FAILURE TO PROVIDE MEDICAL TREATMENT
### (Against Defendant City, Department of Correction, and Officer Defendants)

147.     Mr. Mosquea repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 145 as if fully set forth herein.

148.     The Officer Defendants owed a duty of care to Mr. Mosquea to provide him with medical treatment after he had been assaulted and while he was in the custody of the DOC.

149.     The Officer Defendants allowed Mr. Mosquea to first sit in Holding Pen #5 after the Initial Assault during which he was in excruciating pain after having been brutally beaten and maced multiple times.

150.     The Officer Defendants again allowed Mr. Mosquea to sit in the decontamination pen after the Second Assault during which he was in excruciating pain after having been brutally beaten, before being taken to a doctor.

30

151.     Thereafter, the Officer Defendants failed to take Mr. Mosquea to his scheduled doctor appointments, preventing him from receiving the necessary medical care to treat his injuries and thereby worsening those injuries.

152.     Following the May 21, 2015 assault, Mr. Mosquea failed to receive any medical attention for three days.

153.     The Officer Defendants knew, or should have known, that their failure to provide medical treatment to Mr. Mosquea, or to take him to a doctor, for an extended period of time could and did exacerbate his injuries.

154.     Defendant City, as employer of the Officer Defendants, is vicariously responsible for their wrongdoing.

155.     As a direct and proximate result of this misconduct detailed above, Mr. Mosquea sustained the damages hereinbefore alleged.

## COUNT V

### NEGLIGENT HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING AND RETENTION
### (Against Defendant City, Department of Correction, and Supervisory Defendants)

156.     Mr. Mosquea repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 154 as if fully set forth herein.

157.     Defendant City, through the Defendant DOC, owed a duty of care to Mr. Mosquea to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent and careful person should have anticipated that injury to Mr. Mosquea or to those in a like situation would probably result from the foregoing conduct.

158.    Upon information and belief, all of the Officer Defendants were unfit and incompetent for their positions.

159.    Upon information and belief, Defendant City and the Supervisory Defendants knew or should have known through the exercise of reasonable diligence that the Officer Defendants were potentially dangerous to inmates.

160.    Upon information and belief, Defendant City's and the Supervisory Defendants' negligence in screening, hiring, training, disciplining, staffing, and retaining these Officer Defendants proximately caused Mr. Mosquea's injuries.

161.    As a direct and proximate result of defendants' misconduct, Mr. Mosquea sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

162.    WHEREFORE, Mr. Mosquea requests that the Court enter an Order of Judgment as follows:

- For compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Mosquea as a result of the events alleged herein;

- For punitive damages against the Officer Defendants in an amount to be determined at trial;

- For reasonable attorneys' fees, together with costs and disbursements of this action pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court;

- For pre-judgment interest and post-judgment interest, as allowed by law; and

- For such other and further relief as this Court may deem just and proper.

Dated: August 2, 2016

/s/ Allison L. Waks
Allison L. Waks
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Email: awaks@jonesday.com

## <u>CERTIFICATE OF SERVICE</u>

I, Allison L. Waks, certify that on August 2, 2016, I caused the foregoing Amended

Complaint to be filed with the Clerk of the Court and served upon all counsel of record via the

CM/ECF system.


Dated: August 2, 2016


*/s/ Allison L. Waks*
Allison L. Waks